UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

In re: GENE M. KIRVAN

     Debtor,

GENE M. KIRVAN,

     Appellant/Defendant,

v.

CAMP INN LODGE, LLC,

     Appellee/Plaintiff.
_____/

Case No. 20-CV-12491
Honorable Thomas L. Ludington
Magistrate Judge Patricia T. Morris

Bankruptcy Case No. 17-2274-DOB
Adversary Case No. 17-02120-DOB
Honorable Daniel S. Opperman

**ORDER AFFIRMING BANKRUPTCY COURT'S OPINION AND JUDGMENT**

On December 11, 2017, Appellant/Defendant Gene M. Kirvan ("Kirvan") filed for bankruptcy protection under Chapter 13 of the United States Bankruptcy Code. Shortly thereafter, Appellee/Plaintiff Camp Lodge Inn, LLC ("Camp Inn") filed an adversary complaint against Kirvan, claiming that he had embezzled over $50,000 from Camp Inn and that such funds were non-dischargeable under 11 U.S.C. §§ 523(a)(4) and (a)(6). On August 19, 2020, after a six-day trial on the merits, United States Bankruptcy Court Judge Daniel S. Opperman entered an opinion finding that Kirvan had embezzled $55,857.45 from Camp Inn and that such amount was non-dischargeable under §§ 523(a)(4) and (a)(6). Judge Opperman later entered a judgment awarding Camp Lodge trebled damages of $167,542.35 and reasonable attorney fees and costs under M.C.L. § 600.2919a. Kirvan filed his Notice of Appeal on September 11, 2020. ECF No. 1. The matter has been fully briefed by the parties. ECF Nos. 16, 17, 19. For the reasons stated below, the Bankruptcy Court's Opinion and Judgment will be affirmed.

## I.

### A.

The evidence and arguments introduced at trial were thoroughly recounted in the Bankruptcy Court's findings of fact, which are reprinted below in their entirety:

> The trial of this adversary proceeding, which spanned six days, is a tale of two theories. Camp Inn's first theory is that the testimony and exhibits demonstrate that Mr. Kirvan took $59,752.45 from Camp Inn over the course of approximately 1 ½ years by pulling cash receipts from the hotel operations of Camp Inn and pocketing that money directly.[1] Per Camp Inn, the testimony of lay witnesses sets the foundation for this theory and the testimony of an expert witness, Cynthia Scott, a certified public accountant and certified fraud examiner, establishes the liability of Mr. Kirvan. Camp Inn's second theory examined and explored the reported income and expenses of Mr. Kirvan over the same period to demonstrate that Mr. Kirvan was living well beyond his known income means and therefore must have taken cash from Camp Inn. Mr. Kirvan's defense to these claims necessarily reacted to each theory separately.
>
> Introduction of Parties and Circumstances
>
> Deborah Wiltse is the sole member of Camp Inn. For many years she was involved in the restaurant business with her ex-husband and she has years of experience running a restaurant, Wiltse Brew Pub & Family Restaurant. During this time, Ms. Wiltse befriended Monsignor James Brucksch, the Catholic Priest for her church. As was Ms. Wiltse's family tradition, she included Mons. Brucksch in many family events, including vacations. Ms. Wiltse's marriage ended in divorce, and she received a settlement with her ex-husband of $150,000.00 that paid her a monthly income in which to live. Ms. Wiltse continued to work at the family business, and prior to her divorce she hired Mons. Brucksch as a part-time bookkeeper.
>
> Shortly after her divorce was finalized, Mr. Kirvan entered her life. Mr. Kirvan was likewise in the midst of a divorce proceeding which was finalized in 2011. Mr. Kirvan is a man of many talents. He is a carpenter, a fishing guide on both Lake Huron and various rivers in Northern Michigan, and a manager of hotels. Prior to meeting Ms. Wiltse, he managed a local Days Inn and did various carpentry and fish guiding projects on the side. He moved in with Ms. Wiltse in 2011.

---

[1] Although the Bankruptcy Court mentions the amount $59,752.45, the damages expressly found by the Bankruptcy Court, and testified to at trial, were $55,857.45. *See* ECF No. 13-12 at PageID.4715 (Ms. Scott's report); ECF No. 13-1 at PageID.3839 (Ms. Wiltse's testimony).

Camp Inn Lodge Opportunity

After her 2012 divorce, Ms. Wiltse continued to work at the family restaurant but was increasingly uncomfortable doing so. She started looking for an opportunity to work elsewhere and discovered that a local hotel and restaurant, Woodland Pines, could be acquired. Unfortunately, Ms. Wiltse did not have a substantial amount of money to make a down payment, but she was offered extremely favorable terms by the current owner because he wished to get out of this business. Ms. Wiltse felt extremely comfortable that she could run the restaurant portion of the business, but she had no experience in running a hotel. Mr. Kirvan, however, had significant experience running two local motels and persuaded her that he could manage the hotel operations and she could run the restaurant. After much discussion, the two of them agreed to enter into this enterprise and did so in 2014.

The parties spent significant time at trial arguing whether Mr. Kirvan was a 50% owner of Camp Inn. Camp Inn, through Ms. Wiltse, vehemently denies his assertions and for the most part the paperwork supports her position. First, an original draft of the purchase agreement did include Mr. Kirvan as a purchaser, but his name was quickly taken off all documents at her direction. Second, there is no evidence that Mr. Kirvan advanced any monies whatsoever to acquire Camp Inn or form a new limited liability company. Third, Mr. Kirvan's criminal background precluded him from owning a membership interest in an organization that had a liquor license. While it is true that Mr. Kirvan produced evidence that Ms. Wiltse referred to him as her "partner" either directly or indirectly, the preponderance of the evidence weighs heavily in favor of Ms. Wiltse's position and against Mr. Kirvan's.

Ms. Wiltse and Mr. Kirvan began operating Camp Inn in the spring of 2014. During this time, Ms. Wiltse worked full-time at Camp Inn, but Mr. Kirvan split his time with his then current employer, as well as being a fishing guide. During this time, Mr. Kirvan did some remodeling of Camp Inn but utilized his former employer's account to procure the remodeling resources. Although his former employer's account was used, Camp Inn paid for these resources. Additionally, Mr. Kirvan used some countertops, sinks, fixtures, and keys that he claims were given to him by the previous owner of his previous employer, but that a dispute arose afterwards as to whether these items were actually given to Mr. Kirvan. As a result, Mr. Kirvan pleaded nolo contendere to a criminal charge in state court.

Operation of Camp Inn Lodge Hotel Division

Camp Inn is a classic Northern Michigan lodging enterprise that offers overnight accommodations. Guests check into the hotel at a front desk and make arrangements to pay for their hotel room either with cash, check, or credit card. Quite often, these rooms are reserved ahead of time and Camp Inn utilizes a computer program commonly known as the Room Master program.

Turning to the check-in and payment process, the front desk clerk takes care of the routine confirmation of the rooms, guests and reservations, the exchange of information and keys to a room, and the finalization of payment terms. If a credit card is used, the credit card information is taken and retained on a short-term basis. If a check or cash is the form of payment, the check or cash is received and then placed in an envelope. Each front desk clerk works approximately 8 hours, so for any given day there would be three envelopes, one for each front desk clerk. The envelope containing all of the payment terms or mediums is placed in the package along with the report indicating the particular room rented to the customer and other vital details.

Initially, Mons. Brucksch received the daily envelope and made the necessary arrangements to input the information in Camp Inn's computer, as well as prepare the deposit for the bank. Mons. Brucksch would take the information, prepare the necessary deposit slip and then present this package to the bank for deposit of checks and cash. Approximately 1 ½ months into this process, Mr. Kirvan expressed a great amount of frustration with Mons. Brucksch because he, per Mr. Kirvan, was having difficulty managing all of these tasks. Accordingly, he persuaded Ms. Wiltse to tell Mons. Brucksch that the initial daily packet should be delivered to Mr. Kirvan, who in turn would input the necessary information and then give the check, cash, and credit card information to Mons. Brucksch to process for a deposit. From mid-2014 through mid-2016, this protocol was in place. It is during this time that Camp Inn claims that Mr. Kirvan began slipping cash out of the daily envelopes and pocketing this money. Mr. Kirvan denies doing so.

Per Camp Inn, Mr. Kirvan would receive the daily package and prepare a slip for Mons. Brucksch to review. Since the credit card payments were made directly through the credit card processing system, Mr. Kirvan could not take any of these funds. The same is true for checks made payable to Camp Inn. But cash could be, and in Camp Inn's view, was taken by Mr. Kirvan. As its view goes, Mr. Kirvan would, from time to time, take cash out of the daily packages, jot down a different number for Mons. Brucksch to deposit, and then hand the information to Mons. Brucksch to complete the process.

By early 2016, the personal relationship between Mr. Kirvan and Ms. Wiltse deteriorated. Mr. Kirvan admitted that he was openly utilizing online dating sites while still living with Ms. Wiltse because he could see that this relationship would soon end. Also, he knew that the divorce payments to Ms. Wiltse would soon be completed. Accordingly, Mr. Kirvan arranged to purchase a separate house and began renovations on that house, all without the knowledge of Ms. Wiltse. This came to a head when Ms. Wiltse began learning of some of these developments and she resolved to fire Mr. Kirvan. After doing so, she began examining the hotel receipt records and saw that the expected revenues and the actual revenues

did not match up. She brought in her accountant, who assigned Ms. Scott to investigate the possibility of embezzlement.

Testimony of Cynthia Scott, CPA & CFE

Ms. Scott is a certified public accountant and certified fraud examiner. She has requisite experience and knowledge in fraud and embezzlement investigations and began to review the records of Camp Inn. In doing so, the task before her was formidable because the records of Camp Inn were not well kept. After Mons. Brucksch made the deposit at the bank, the necessary deposit information was placed in the daily package and then sealed and placed in a box in the open office area shared by Ms. Wiltse, Mr. Kirvan, and others employed by Camp Inn. After collecting a month of daily packages in a box, the box was then placed in a more secluded area at an onsite location. When Ms. Scott began reviewing the individual packages, she saw a huge disconnect between the amount actually reported as cash receipts in the Room Master program and the amounts deposited with the bank. Also, many of the daily sheets maintained by the individual front desk clerks were missing, with a majority of the missing sheets involving days where cash was supposedly received by the hotel clerk. In her professional opinion, Ms. Scott believed that she could not rely upon the actual source data, that is the front desk clerk's daily reports to reconstruct the receipts of Camp Inn. Instead, Ms. Scott had to try to reconstruct the actual cash receipts by resorting to the Room Master program. In doing so, Ms. Scott concluded that she could accurately reconstruct the cash receipts that should have been deposited on behalf of Camp Inn, but which were not. Exhibit 3 is her report that details her analysis and concludes that $59,752.45 was missing.

Ms. Scott, as part of her investigation, interviewed various employees of Camp Inn and attempted to reconcile the reports that she was given with their statements. In doing so, she realized that Mr. Kirvan was the first and only person who could have made the necessary modifications to the deposit slip filled out by Mons. Brucksch and take the cash received by the front desk clerk. For example, Mr. Kirvan was the first person to receive the daily packages, rewrite the information, and take money from the packet before giving it to Mons. Brucksch for deposit. Second, various employees told her that they noticed the daily sheets prepared by the front desk clerks sometimes were thrown away by Mr. Kirvan but that no one brought that to Ms. Wiltse's attention at the time he did so. Per Ms. Scott's review and testimony, the amounts written by Mr. Kirvan on the deposit report matched the amounts received by Mons. Brucksch and deposited with the bank, which left Mr. Kirvan as the only possible person who could have taken cash under this scenario.

The challenge facing Ms. Scott, however, was to establish the amount actually taken by Mr. Kirvan. The source documents were either destroyed or not available, so Ms. Scott began examining the Room Master program to see if she could reconstruct the cash receipts. In doing so, she noted a number of variations

between the Room Master report of cash receipts and the amount deposited by Mons. Brucksch. From her review of the Room Master program, she concluded that Mr. Kirvan took the amount claimed by Camp Inn.

Camp Inn's Claim of Direct Evidence of Taking of Money by Mr. Kirvan

Ms. Scott also examined the curious case of Cora Hewitt. Ms. Hewitt works as a waitress for the restaurant portion of Camp Inn. Because of some family issues, Ms. Hewitt did not have a place to stay and therefore became a long-term tenant of Camp Inn in one of its hotel rooms. Ms. Hewitt does not have a credit card, so she paid her rent with cash on a sporadic basis. When the records for her room are closely examined, there is a discrepancy between the amounts she paid per the Room Master program and the amounts reported by Mr. Kirvan as a cash payment that was subsequently deposited by Mons. Brucksch. Per Ms. Scott's analysis, this is direct confirmation that there was slippage between the cash actually received by the front desk clerk and reported initially by that clerk compared to the amount actually reported by Mr. Kirvan for deposit by Mons. Brucksch to the bank.

In particular, Exhibits 19 and 25 evidence that Ms. Hewitt paid cash of $50 on August 15 that was noted by the Room Master program, as well as the drop sheet. Mr. Kirvan reported a $50 deposit but as a credit card and therefore no cash was deposited by Mons. Brucksch on that day. So, by analogy and extension, for other accounts and entries Ms. Scott concludes Mr. Kirvan took $59,752.45.

Finally, Ms. Scott testified that after Mr. Kirvan left in July of 2016, the cash deposits reported by Room Master matched the deposits actually made by Mons. Brucksch at the bank. Moreover, the credit card payments reported by Room Master matched the actual credit card receipts reported by the bank.

Mr. Kirvan vehemently disputes these arguments and claims and points out a series of weakness in the Room Master program. Initially, he points out that the Room Master program is designed more to manage the day-to-day use of a hotel room, to coordinate when a hotel room is being reserved, used, and when it needs to be cleaned. Per Mr. Kirvan, the Room Master program was not designed to track actual receipts and does a poor job in doing so. Many of the examples given by Mr. Kirvan support his general contention that there was and is slippage between what is actually happening in a hotel, as opposed to the Room Master program view of reality.

Also, Mr. Kirvan pointed out that there is no direct testimony that he threw away any daily sheets and that he does not recall doing so. Although others testified that they saw various daily sheets in the trash can utilized by Mr. Kirvan, he rebuts that testimony by indicating that many people, including Ms. Wiltse, Mons. Brucksch, servers, housekeepers, and the front desk personnel all had access to this area and the daily packages, as well as himself. Moreover, Mr. Kirvan makes

the practical point that if he were to destroy evidence as described by others, he surely would not have done it in open sight as claimed by them. Finally, to emphasize the point, Mr. Kirvan testified that many people had access to the records after he finished with them on a daily basis and certainly after he left Camp Inn in 2016.

What Mr. Kirvan does not explain, however, is that while certain cash receipts documents were missing, others remain.

Comparison of Mr. Kirvan's Income and Expense

Camp Inn buttresses its first theory by examining the expenses incurred by Mr. Kirvan and comparing those expenses with his income from tax returns from 2014-2017. This nuanced process can be summarized as follows:

First, Camp Inn started with the divorce pleadings filed by Mr. Kirvan, notably various representations made by him of his assets, including cash at the time his divorce was filed. Next, Camp Inn took the actual income reported by Mr. Kirvan in his tax returns, as well as the sale of various assets that generated cash but were not necessarily reportable to the IRS. After reaching the conclusion of the amount of cash available to Mr. Kirvan, Camp Inn then reviewed various expenses, as reported in bank statements and other known expenses to arrive at an amount spent by Mr. Kirvan during the appropriate period of time. Also added into this calculation was the purchase of a different home by Mr. Kirvan and remodeling costs of that home. Exhibit 42 demonstrates this type of analysis.

This analysis starts with income Mr. Kirvan received in 2014 of $26,318.00 from his wages and charter fishing income, along with miscellaneous income from his PayPal account of $1,671.72. Using Exhibit 42 as a guide, Mr. Kirvan's known income and expenses are summarized as follows:

|  | 2014 | 2015 | 2016 |
|---|---|---|---|
| Income | $26,318.00 | $45,909.00 | $36,732.00 |
| Paypal | $1,671.00 | $2,981.00 | $4,600.00 |
| Total Deposits | $28,080.00 | $41,716.00 | $50,900.00 |
| Known Expenses | $24,575.00 | $45,238.00 | $52,121.00 |

In addition, Camp Inn did not take into account expenses for food, clothing, gas, entertainment or personal care because there were no documents to support the actual amount spent, although Mr. Kirvan must have spent some money on these items.

> In response, Mr. Kirvan states that he started off with slightly more cash than attributed by Camp Inn and that he kept larger amounts of cash in a safe but never told anyone that he kept those large amounts of cash. Also, Mr. Kirvan disputes certain parts of the analysis by Camp Inn and indicates that he from time to time would receive tips and other income from the guests he hosted on various fishing trips.
>
> Moreover, Mr. Kirvan testified that he ate his meals at Camp Inn, so he had little to no food expense and that he incurred minimal clothing, entertainment or other personal care expenses.

ECF No. 1 at PageID.8–17.

**B.**

Based on the evidence and arguments recounted above, the Bankruptcy Court found that Kirvan embezzled at least $55,857.45 from Camp Inn and that such amount was non-dischargeable under 11 U.S.C. §§ 523(a)(4) and (a)(6). ECF No. 1 at PageID.24.

Kirvan presents at least three issues on appeal: (1) whether the Bankruptcy Court erred in finding that Kirvan misappropriated at least $55,857.45; (2) whether the Bankruptcy Court erred in finding that the $55,857.45 was non-dischargeable under 11 U.S.C. §§ 523(a)(4) and (a)(6); and (3) whether the Bankruptcy Court erred in qualifying Ms. Scott's testimony as an expert opinion. As explained below, the Bankruptcy Court committed no reversible error.

**II.**

Final orders of a bankruptcy court can be appealed to a federal district court under 28 U.S.C. § 158(a). *In re Gourlay*, 496 B.R. 857, 859 (E.D. Mich. 2013). "Th[is] Court reviews a bankruptcy court's findings of fact for clear error and its conclusions of law de novo." *Id*. (citing *AMC Mortg. Co. v. Tenn. Dep't of Revenue,* 213 F.3d 917, 920 (6th Cir.2000)). "A finding of fact is clearly erroneous when, after reviewing the full record, [the reviewing court] [is] left with the definite and firm conviction that a mistake has been committed." *EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 978 F.3d 418, 428 (6th Cir. 2020) (internal quotation marks omitted).

## III.

### A.

The record amply supports the Bankruptcy Court's finding that Kirvan misappropriated at least $55,857.45 in cash from Camp Inn.

Much of the evidence at trial concerned Camp Inn's protocol for handling cash. To summarize, cash received by the front desk clerk would be noted in Room Master, the program that Camp Inn used to manage room rentals. At the end of her shift, a clerk would place any cash received in an envelope along with her "drop sheet," a physical tally of cash and credit card totals from her shift. At the end of the day, the clerk would slip the envelope through the door of an office where Kirvan, as hotel manager, would review the envelopes, write the cash and credit totals on the outside of the envelope, and prepare a deposit slip. He would then forward the cash, envelope, drop sheets, and deposit slip to Father Brucksch, who handled Camp Inn's bank deposits.

Based on her months-long investigation into Camp Inn, Ms. Scott testified that at least $55,857.45 in cash receipts had been misappropriated during Kirvan's tenure. ECF No. 13-13 at PageID.3989–90. Ms. Scott arrived at the $55,857.45 figure—a "conservative" estimate, in her opinion—by comparing the cash totals reported in Room Master with those reflected on the envelopes prepared by Kirvan. *Id.* at PageID.3989–96. Importantly, the envelope totals almost always matched the amounts actually deposited in Camp Inn's bank account. *Id.* at PageID.3975. In other words, if cash was being misappropriated anywhere in the chain-of-custody, it must have been somewhere in the few links between Room Master and Kirvan's envelope review. Ms. Scott found no comparable discrepancies with the credit card totals, and Camp Inn's cash shortage resolved shortly after Kirvan was terminated. *Id.* at PageID.3990–92.

Ms. Scott is a certified public accountant and certified fraud examiner with 17 years of experience. *Id.* at PageID.3963–64. Her testimony, along with evidence of Kirvan's role as hotel manager, would allow a reasonable person to infer that Kirvan was responsible for embezzling $55,857.45 from Camp Inn.

Kirvan's primary argument on appeal is essentially the same as it was at trial—that Ms. Scott's testimony is unreliable because it presumes the integrity of Room Master. Kirvan argues that Room Master was inaccurately tracking cash receipts and thereby created the illusion of cash discrepancies where none existed. *See* ECF No. 16 at PageID.6816–6824.

Kirvan's theory is extraordinarily shallow. He introduces no expert testimony regarding Room Master or Camp Inn's finances. Kirvan instead relies on his own review of Camp Inn's records.[2] For example, Kirvan's Exhibit MM—which is essentially a copy of Camp Inn's Exhibit 35 that Kirvan has annotated—purports to show startling discrepancies between the daily totals reported by Room Master and those reflected on the envelopes. *See* ECF No. 15-23. For Kirvan's purposes, the most damning discrepancy would seem to be the difference in credit card totals. If Room Master misreported credit card receipts—for which there is no claim of embezzlement—then surely it could also have misreported cash receipts.

To illustrate these discrepancies, Kirvan provided a table of credit card data from September 2015 in his opening brief. *See* ECF No. 16 at PageID.6811–12. The table provides, in part:

|  | Exhibit 25 (Envelope) | Exhibit 32 (Deposit) | Exhibit 35 (Room Master) |
|---|---|---|---|
| 9/1 | $1034.12 | $1034.12 | $1195.72 (over) |
| 9/2 | $934.12 | $934.12 | $836.93 (under) |

---

[2] Kirvan has no apparent education, expertise, or experience in accounting.

| | | | |
|---|---|---|---|
| 9/4 | $237.58 | $237.58 | $442.75 (over) |
| 9/5 | $466.57 | $466.57 | $23.97 (under) |
| 9/6 | $2969.76 | $2969.76 | $3929.85 (over) |

*See* ECF No. 16 at PageID.6811. The table shows that while the credit card totals on the envelope were consistent with Camp Inn's credit card deposits, Room Master regularly reported a higher or lower amount.

While alarming at first glance, these discrepancies have a rather mundane explanation. During cross-examination, Ms. Scott testified that such discrepancies were attributable to the delay between when credit card payments were entered in Room Master and when such payments were actually processed.

> Q: Do you see a difference between what Room Master is reporting and what is indicated is on the envelope and in the account?
>
> A: I see differences on this information, correct.
>
> […]
>
> Q: That's not matching, is it?
>
> A: With the – with the way that credit cards work, they're not going to – on many occasions, they're not going to be day for day exact. You have to look at a period of time and look at the big picture because it's not going to be timing [sic].
>
> Q: Ma'am, how – how can you possibly establish that or state that when a credit card is entered that very day and at the time of its entry it goes to the account. Even – even if it goes over a day or two you can identify the account and Room Master, the clerk at that time puts that very same amount in Room Master.
>
> A: Because when we did our interviews of the employees they were not always putting them into Room Master at the same time.
>
> Q: How do you –

> A: Sometimes it was at check in, sometimes it was at check out, depends on how many days they're staying.[3]

ECF No. 13-8 at PageID.4628–30. Consistent with her explanation, Ms. Scott testified that there were no meaningful discrepancies when the credit card totals were compared over longer periods of time. *Id.* at PageID.4612–13, 4620. Indeed, when looking at 2015 in its entirety, there was only a 0.28% difference between the credit card totals reported in Room Master and those reported on the envelopes. *Id.* at PageID.4631.

On appeal, Kirvan derides Ms. Scott's explanation as "meaningless" because she allegedly failed to consider non-room transactions involving credit cards (*e.g.*, pool passes, bags of ice), which Kirvan claims are not entered in Room Master. ECF No. 16 at PageID.6821. Kirvan alleges that in 2015, such transactions totaled $7,562.09. *Id.* If true, this would suggest that the credit card variation between Room Master and the envelopes is much greater than 0.28%. Kirvan supports his argument with generic references to the envelopes, bank statements, and Room Master data. *See id.* at PageID.6820–21.

Kirvan's argument is without merit. It is undisputed that the credit card totals on the envelopes accurately reflect the amounts deposited in Camp Inn's bank accounts. And as stated above, Ms. Scott's report shows that in 2015, the credit card total in Room Master varied from the credit card total on the envelopes by only $900 (0.28%). ECF No. 15-17 at PageID.6552. Presumably, then, non-room credit card transactions must have been entered in Room Master or otherwise accounted for by Ms. Scott in her investigation. In any event, Kirvan points to no specific place in the record showing (1) that non-room credit card purchases were omitted from

---

[3] Ms. Scott offered the same explanation for purported discrepancies in Room Master's cash reporting. *See* ECF No. 13-8 at PageID.4644. Ms. Scott further testified that all cash discrepancies were accounted for in her report. *Id.* at PageID.4658–59.

Room Master, (2) that Ms. Scott ignored any credit card purchases omitted from Room Master, or (3) that such transactions totaled $7,562.09.[4]

Based on the foregoing, the Bankruptcy Court did not clearly err in finding that Ms. Scott could rely on Room Master in preparing her testimony.

Furthermore, while Ms. Scott's testimony is necessary to sustain Camp Inn's embezzlement theory, it was not the only evidence of embezzlement at trial. The record discloses at least two other indicia of embezzlement.

First, a suspicious number of drop sheets were missing from the envelopes. Indeed, according to Ms. Scott, the dearth of drop sheets was the reason that she chose to reconstruct Camp Inn's finances using Room Master. *See* ECF No. 13-3 at PageID.3969–70. A reasonable person could infer that drop sheets were being destroyed to obscure the misappropriation of cash receipts. Consistent with that inference, Ms. Wiltse testified that on at least one occasion, she observed discarded drop sheets in a waste basket that Kirvan used. ECF No. 13-1 at PageID.3790, 3866. However, as Kirvan noted at trial, many employees had access to that waste basket and the room where the envelopes were stored. ECF No. 13-7 at PageID.4403–04.

The Bankruptcy Court decided—albeit "[b]y a close margin"—that the missing drop sheets were circumstantial evidence of embezzlement. ECF No. 1 at PageID.22. On appeal, Kirvan presents no convincing reason why that decision was clearly erroneous. While it is at least possible that other employees manipulated Camp Inn's records, there was no evidence at trial indicating that another employee was responsible. In fact, there is no allegation that any employee besides Kirvan was embezzling. Moreover, Kirvan testified that during his tenure as hotel manager, all of the drop sheets, except for perhaps a couple dozen, were properly delivered

---

[4] Notably, while Kirvan's counsel thoroughly interrogated Ms. Scott's testimony at trial, he does not seem to have elicited any testimony from her regarding non-room credit card transactions.

to him in their envelopes by the front desk clerks. ECF No 13-6 at PageID.4300–01. Given the scarcity of innocent explanations, the Bankruptcy Court did not clearly err in finding the lack of drop sheets to be circumstantial evidence of embezzlement.

Second, as recounted in Section I.A., *supra*, Kirvan's known expenses substantially exceeded his reported income. Notably, Kirvan's "known expenses" did not include cash expenses on items like gasoline and food, even though Ms. Wiltse testified that Kirvan operated "almost exclusively" with cash. ECF No. 13-1 at PageID.3824. At trial, Kirvan had various explanations for his curious cash surplus. He testified that he received unreported bonuses from his prior employer and substantial gratuities from his charter fishing business, Calypso Sports Fishing Charters.[5] ECF No. 13-6 at PageID.4280–81; ECF No. 13-8 at PageID.4578. He also claimed to have saved a substantial amount of cash in a safe that no one—not even Ms. Wiltse—knew about. ECF No. 13-1 at PageID.3833; ECF No. 13-6 at PageID.4282. The Bankruptcy Court rejected these explanations and found Kirvan's finances to be circumstantial evidence of embezzlement. ECF 1 at PageID.23.

On appeal, Kirvan only briefly mentions his finances and maintains the same dubious explanations. Simply put, there is no reason to believe that Kirvan's unreported income was the result of secret cash reserves and substantial gratuities—allegedly earned while his fishing business reported thousands of dollars in net losses—rather than the ill-gotten fruit of a well-substantiated scheme. *See, e.g.*, ECF No. 15-20 at PageID.6645 (Kirvan's Form 1040 Schedule C for 2015). Furthermore, because the question of Kirvan's finances necessarily involved measuring his credibility as a witness, the Bankruptcy Court's finding on the matter should not be so readily disturbed. *See Suggs v. ServiceMaster Educ. Food Mgmt.*, 72 F.3d 1228, 1232 (6th

---

[5] Kirvan's former employer, Ronald Cherf, denied paying Kirvan any cash bonuses. ECF No. 13-2 at PageID.3876. Kirvan, however, testified that the bonuses were paid by check and, for whatever reason, not reported on Kirvan's W-2. ECF No. 13-6 at PageID.4280–81.

Cir. 1996) ("[The reviewing court] must give due regard to the trial court's opportunity to judge the credibility of the witnesses.") (quoting Fed R. Civ. P. 52(a)(6)).

Based on the foregoing, the Bankruptcy Court's did not clearly err in finding that Kirvan had misappropriated at least $55,857.45 from Camp Inn.[6]

**B.**

The Bankruptcy Court also did not err in holding that the $55,857.45 was non-dischargeable under 11 U.S.C. §§ 523(a)(4) and (a)(6). The Bankruptcy Code states,

(a) A discharge under section 727, 1141, 11921 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . .

> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; . . .
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity . . . .

11 U.S.C § 523(a). The applicability of each section is considered below.

**1.**

"[F]or Section 523(a)(4) purposes, federal common law, rather than state law, controls the meaning of these terms." *In re Noblit*, 327 B.R. 307, 311 (Bankr. E.D. Mich. 2005). "Federal common law defines embezzlement as 'the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.'" *Id.* (quoting *In re Brady*, 101 F.3d 1165, 1172–73 (6th Cir.1996)). "A creditor proves embezzlement by showing that [1] he entrusted his property to the debtor, [2] the debtor appropriated the property for a use other than that for which it was entrusted, and [3] the circumstances indicate fraud." *In re Brady*, 101 F.3d at 1173.

---

[6] This Court declines to consider the issue of Cora Hewitt's rent. While the parties have raised the issue on appeal, the Bankruptcy Court awarded no damages for the alleged misappropriation of Ms. Hewitt's rent, and, as discussed above, Ms. Scott's testimony and other circumstantial evidence provide an adequate basis for finding that Kirvan misappropriated $55,857.45 from Camp Inn.

The first two elements are readily established. As explained in Section III.A., *supra*, the Bankruptcy Court correctly found that Kirvan misappropriated at least $55,857.45 from Camp Inn. Additionally, it is undisputed that cash receipts appropriated for Kirvan's personal use would have been "appropriated for a use other than that for which [they] were entrusted." *In Re Brady*, 101 F.3d at 1173. Thus, the question here is whether Kirvan misappropriated the proceeds under "circumstances indicat[ing] fraud." *Id.* With respect to the fraud element, the Sixth Circuit Bankruptcy Appellate Panel has explained,

> The "fraud" required under § 523(a)(4) is "fraud in fact, involving moral turpitude or intentional wrong." Accordingly, embezzlement claims under § 523(a)(4) require "proof of the debtor's fraudulent intent in taking the [creditor's] property." As the *Brady* definition suggests, the debtor's fraudulent intent may often be shown by circumstantial evidence.

*In re Fox*, 370 B.R. 104, 116 (B.A.P. 6th Cir. 2007) (internal citations omitted). Kirvan argues that he cannot be liable for embezzlement because Camp Inn introduced no evidence that he "purposefully concealed funds" or otherwise acted with fraudulent intent. ECF No. 16 at PageID.6823–24. His argument is unpersuasive.

First, Kirvan's misreporting of cash totals is itself evidence of fraudulent intent. The only plausible reason for someone misappropriating cash to also manipulate the records of cash receipts would be to conceal his misappropriation. Similarly, the missing drop sheets and Kirvan's unreported income are strong circumstantial evidence of an intent to conceal the misappropriation of cash. Circumstantial evidence of this kind is sufficient. *See In re Bowman*, 607 B.R. 614, 623 (Bankr. W.D. Ky. 2019) ("[C]ircumstantial evidence of a debtor's concealment of his use of entrusted property can establish fraudulent intent and satisfy the third element.").

Accordingly, the Bankruptcy Court correctly held that Kirvan embezzled the $55,857.45 for purposes of 11 U.S.C. § 523(a)(4) and that such amount was non-dischargeable.

**2.**

With respect to § 523(a)(6), "assessing whether an injury is 'willful and malicious' . . . is a two-pronged inquiry. A creditor must prove both elements before the debt may be exempted from discharge." *In re Berge*, 953 F.3d 907, 916 (6th Cir. 2020), *reh'g denied* (May 6, 2020), *cert. denied sub nom. MarketGraphics, Inc v. Berge*, No. 20-457, 2021 WL 78121 (U.S. Jan. 11, 2021). "'Willful' conduct, for purposes of § 523(a)(6), requires 'actual intent to cause injury,' 'not merely a deliberate or intentional act that leads to injury.'" *Id.* at 915 (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)). "Malicious," on the other hand, means "in conscious disregard of one's duties or without just cause or excuse." *Id.* (quoting *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986)).

With respect to willfulness, the Sixth Circuit observes a subjective test. "[T]he debtor must 'desire[] to cause consequences of his act, or . . . believe[] that the consequences are substantially certain to result from it.'" *Id.* at 915 (quoting *In re Markowitz*, 190 F.3d 455, 464 (6th Cir. 1999)). However, "[a] debtor need not actually admit his intent; intent may be inferred from the circumstances of the injury." *Id.*

As with the § 523(a)(4) exception, the primary issue here is Kirvan's mental state; namely, whether he acted willfully and maliciously. According to Kirvan, "[t]he [B]ankruptcy [C]ourt did not specifically find that Kirvan committed an intentional act with the express purpose of causing harm to Camp Inn," and "Camp Inn [] failed to prove that Kirvan intended the consequential injury of his alleged act." ECF No. 16 at PageID.6826–27. He also argues that

Camp Inn introduced no "evidence that he acted in complete disregard of his duties without just cause or excuse." *Id.* at PageID.6827. Kirvan's arguments find no support in the record.

First, the Bankruptcy Court did directly address Kirvan's mental state, reasoning that "if any money was taken by Mr. Kirvan, he must have known that the taking of this money would have the consequence that Camp Inn would not have the money or the use of this money." ECF No. 1 at PageID.21. Kirvan does not explain why the Bankruptcy Court's reasoning is fallacious. Indeed, it seems logical to infer that a manager who intentionally misappropriates cash and manipulates internal records also intends to deprive his employer of such cash.

Second, with respect to malice, the uncontroverted testimony at trial was that Camp Inn entrusted Kirvan to prepare Camp Inn's cash receipts for deposit. *See* ECF No. 13-1 at PageID.3837. There is no indication that Kirvan had a right to or interest in Camp Inn's cash receipts. Accordingly, the record supports the inference that insofar as Kirvan misappropriated cash receipts, he did so "in conscious disregard of [his] duties or without just cause or excuse." *In re Berge*, 953 F.3d at 915.

Kirvan also argues—for the first time on appeal—that Camp Inn's "failure to protect its collateral" precludes it from arguing that the $55,857.45 is non-dischargeable under 11 U.S.C. § 523(a)(6). ECF No. 16 at PageID.6827–28. Kirvan relies on *In re Wolfson*, 56 F.3d 52 (11th Cir. 1995), where the Eleventh Circuit held that a secured creditor's knowing failure to object to the wrongful disposition of collateral waives its right to argue that a debt is non-dischargeable under 11 U.S.C. § 523(a)(6). *Id.* at 54–55. Generally, arguments not presented before the Bankruptcy Court are waived on appeal. *In re Allen-Morris*, 523 B.R. 532, 538 (E.D. Mich. 2014). Accordingly, Kirvan has waived the right to argue his "failure to protect" defense.

Based on the foregoing, the Bankruptcy Court did not err in finding that the $55,857.45 was non-dischargeable under 11 U.S.C. §§ 523(a)(4) and (a)(6).

## C.

Finally, the Bankruptcy Court did not err in qualifying Ms. Scott's testimony as an expert opinion. The admissibility of expert opinions is governed by Federal Rule of Evidence 702. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008).

> Parsing the language of the Rule, it is evident that a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements. First, the witness must be qualified by "knowledge, skill, experience, training, or education." Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Third, the testimony must be reliable. Rule 702 guides the trial court by providing general standards to assess reliability: whether the testimony is based upon "sufficient facts or data," whether the testimony is the "product of reliable principles and methods," and whether the expert "has applied the principles and methods reliably to the facts of the case."

*Id.* at 528–29 (internal citations omitted); *see also In re Creekside Sr. Apartments*, LP, 477 B.R. 40, 63 (B.A.P. 6th Cir. 2012) (observing same inquiry for bankruptcy proceedings).

On appeal, Kirvan argues that Ms. Scott's testimony was not expert testimony at all, characterizing it as "lay testimony comparing numbers from two sources."[7] ECF No. 16 at PageID.6830–31. But Ms. Scott did much more than "compar[e] numbers from two sources." *Id.* She conducted a months-long fraud examination at Camp Inn that included a thorough review of Camp Inn's physical and electronic records as well as interviews with its employees. *See* ECF No. 14-21 (Ms. Scott's engagement letter and billing). Based upon her investigation and her 17 years of experience in fraud examination, Ms. Scott opined that Kirvan had embezzled at least

---

[7] To the extent that Kirvan challenges Ms. Scott's qualification as an expert, he waived that challenge at trial when his counsel expressly agreed that Ms. Scott qualified. ECF No. 13-3 at PageID.3966. Additionally, the Sixth Circuit has affirmed the qualification of much less credentialed accountants. *See, e.g.*, *United States v. Winkle*, 477 F.3d 407, 416 (6th Cir. 2007) (qualifying accounting employee as expert in bank fraud conspiracy even though he was not a certified public accountant).

$55,857.45 from Camp Inn. Kirvan's suggestion that Ms. Scott's opinion is no more scientific than his own is without merit.

Kirvan next argues that Ms. Scott's testimony was unreliable because it was based on Room Master. He correctly notes that when an expert opinion lacks sufficient evidence or is otherwise contradicted by undisputed facts, it cannot "support the trier of the fact's verdict." ECF No. 16 at PageID.6829 (citing *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)). However, as explained in Section III.A., *supra*, the purported failures of Room Master were premised on Kirvan's own erroneous review of the data. While Room Master may not be the best software for tracking payments, there is no indication that it rendered Ms. Scott's testimony unreliable.

Kirvan also argues that the Bankruptcy Court erred "in ignoring and giving no weight to Kirvan's undisputed testimony [regarding Room Master]." ECF No. 16 at PageID.6830. However, the Bankruptcy Court expressly considered Kirvan's testimony on the reliability of Room Master and even found that he was "correct up to a point." ECF No. 1 at PageID.22. Nonetheless, the Bankruptcy Court relied on Ms. Scott's professional opinion that Room Master, though "imperfect," was "sound enough." *Id.* at PageID.22–23. The Bankruptcy Court did not err in weighing Ms. Scott's expert opinion as more credible and reliable than Kirvan's lay opinion.

## IV.

Accordingly, it is **ORDERED** that the Bankruptcy Court's Opinion and Judgment, ECF Nos. 94 and 99 in No. 17-02120-DOB, are **AFFIRMED**.

Dated: February 19, 2021                                        s/Thomas L. Ludington
                                                                THOMAS L. LUDINGTON
                                                                United States District Judge